United States Courts
Southern District of Texas
FILED

NC

JUN 2 6 2003

Michael N. Milby, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| ELAINE L. CHAO, Secretary of the United States Department of Labor,<br><br>Plaintiff,<br><br>vs.<br><br>ENRON CORPORATION, an Oregon corporation; JAMES S. PRENTICE; RODERICK J. HAYSLETT; TOD A. LINDHOLM; CINDY K. OLSON; SHEILA D. ARMSWORTH; PAULA H. RIEKER; KENNETH L. LAY; JEFFREY K. SKILLING; ROBERT A. BELFER; NORMAN P. BLAKE, JR.; RONNIE  C. CHAN; JOHN H. DUNCAN; WENDY L. GRAMM; KEN L. HARRISON; ROBERT K. JAEDICKE; CHARLES A. LEMAISTRE; JOHN MENDELSOHN; PAULO V. FERRAZ PEREIRA; FRANK SAVAGE; JOHN WAKEHAM; HERBERT S. WINOKUR, JR.; ENRON CORPORATION SAVINGS PLAN; AND ENRON CORPORATION EMPLOYEE STOCK OWNERSHIP PLAN,<br><br>Defendants. | Complaint for<br>ERISA Violations<br><br>H-03-2257 |

Elaine L. Chao, Secretary of the United States Department of Labor ("the Secretary"), alleges:

**I.   BACKGROUND:**

1.    The Secretary is charged with enforcing the provisions of Title I of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1001 et seq. ERISA was enacted, in part, to ensure "the soundness and stability of plans with respect to adequate funds to pay

promised benefits." ERISA § 2(a), 29 U.S.C. § 1001(a).  In order to protect pension investments, ERISA requires that those who manage plan investments act with loyalty to the interests of plan participants, prudently and in accordance with plan documents.  See ERISA §§ 404(a)(1)(A), (B) & (D), 29 U.S.C. §§ 1104(a)(1)(A), (B) & (D).

 2. When ERISA's strict fiduciary standards are not met, the Secretary has the authority to seek relief under ERISA §§ 409 and 502(a)(2) & (5), 29 U.S.C. §§ 1109 and 1132(a)(2) & (5), to redress violations and restore plan losses.  The Secretary may also seek injunctions to prevent those who have violated their fiduciary duties in the past from managing or providing services to employee benefit plans in the future.

 3. On December 2, 2001, Defendant Enron Corporation ("Enron"), an Oregon corporation with its principal place of business located at 1400 Smith Street, Houston, Texas 77002 and then considered the seventh largest publicly traded corporation in the United States, declared bankruptcy.  Case No. 01-16034 (AJG) (S.D.N.Y. 2001).  At the time, it was the largest bankruptcy in history.

 4. At the time of Enron's bankruptcy, two of the largest investors in Enron stock were Enron's own pension plans - the Enron Corporation Savings Plan #001 (formerly # 333) ("Savings Plan") and the Enron Corporation Employee Stock

Ownership Plan #009 (formerly #335) ("ESOP"), (collectively the "Plans").

5. The Savings Plan was a defined contribution pension plan that was designed to provide retirement benefits to more than 20,000 Enron employees, retirees, and their beneficiaries. Under the terms of the Savings Plan, participants could contribute up to 15% of their eligible base pay to the Plan and allocate the contributions to a wide variety of investment funds, including an Enron stock fund. In addition, Enron made matching employer contributions to the Savings Plan subject to limits specified in the Plan's governing documents. The Savings Plan provided that employer contributions would "primarily" be invested in Enron stock. In practice, however, the Plan's fiduciaries never exercised their discretion to invest employer contributions in anything other than Enron stock until November, 2001.

6. The ESOP was a defined contribution pension plan that was designed to provide retirement benefits to more than 7,600 Enron employees, retirees, and their beneficiaries. The ESOP's governing documents provided that the ESOP would be "primarily" invested in Enron stock. In practice, the ESOP was at all relevant times invested almost exclusively in Enron stock.

7.    At the beginning of 2001, more than half of the
Savings Plan's assets (over $1.1 billion), and essentially all
of the ESOP's assets (over $1 billion), consisted of Enron
stock.  In total, the ESOP and Savings Plan held more than $2.1
billion in Enron stock, representing two-thirds of the Plans'
total assets.  By the end of the year, when Enron declared
bankruptcy, the Plans' shares totaled little more than $10
million.  Throughout the course of the year, Enron's stock price
consistently and dramatically dropped from a January 26 closing
price of $86 per share to a December 2 price of 40 cents per
share.

8.    As Enron's stock lost nearly all of its value
during 2001, the Plans' fiduciaries never considered the
prudence of the Plans' investment in Enron stock or took any
action to protect the value of the participants' retirement
accounts.  As a result of the fiduciaries' total and complete
inaction, the Plans lost much of their value and thousands of
participants were left with uncertain futures.

9.    At all relevant times, the Plans were managed by
three distinct sets of fiduciaries:  (1) the Administrative
Committee for the Enron Plans, which was charged with the
responsibility to oversee the management of the Enron Plans,
including both the ESOP and the Savings Plan; (2) Enron, Kenneth
L. Lay and Jeffrey K. Skilling, who were responsible for



appointing and overseeing the Administrative Committee; and (3)
Enron's Board of Directors (including Lay and Skilling), who
were responsible for appointing and overseeing a Trustee to
manage the ESOP's investments in Enron stock.

10.   Because none of these fiduciaries complied with
their obligations under ERISA, they are named as defendants
herein and are jointly and severally liable for the losses they
have caused to the Plans.

11.   In particular, the Administrative Committee never
effectively monitored, reviewed, analyzed, questioned, altered,
slowed or stopped the Plans' investments in Enron stock.
Without ever even considering the prudence of the Plans'
investment in Enron stock, the Administrative Committee expended
all of Enron's matching contributions on Enron stock, kept the
Enron stock fund as an investment option under the Savings Plan,
and retained all of both Plans' extensive holdings in Enron
stock.

12.   Enron, Lay and Skilling were responsible for
appointing and overseeing the Administrative Committee, and
consequently, had fiduciary responsibilities for the ESOP and
Savings Plan.   Nevertheless, they never monitored the
Administrative Committee's performance of its responsibilities,
never supplied the Committee members with critical adverse
information known to them about Enron's financial condition, and

never sought to remove the Committee members for failing to discharge their obligations at any time before Enron's bankruptcy.  Further, Lay himself misled participants about Enron's financial health, encouraging them to imprudently invest plan assets in Enron stock.  Accordingly, Enron, Lay and Skilling violated their duties of loyalty and prudence to the Plans' and the Plans' participants.

13.    The members of Enron's Board of Directors were responsible for approving the specific terms of the Plans.  The ESOP, by its terms, provided that "[t]he [ESOP's] Trustee shall be appointed, removed, and replaced by and in the sole discretion of the Directors" and that the trustee would be "the 'named fiduciary' with respect to the investment of the [ESOP's] assets" (ESOP Article 16, Section 1).  The Board of Directors, however, failed to ever appoint a trustee for the ESOP and left the ESOP without a fiduciary responsible for managing its investments in Enron stock.

### a.    Jurisdiction and Venue:

14.    This action arises under ERISA and is brought by the Secretary to obtain relief under ERISA §§ 409 and 502(a)(2) & (5), 29 U.S.C. §§ 1109 and 1132(a)(2) & (5), to redress violations and enforce the provisions of Title I of ERISA.



Thus, this Court has subject matter jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

15. Venue with respect to this action lies in the Southern District of Texas pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

**b.    Parties:**

16. The Secretary, pursuant to ERISA §§ 502(a)(2) & (5), 29 U.S.C. §§ 1132(a)(2) & (5), has the authority to enforce the provisions of Title I of ERISA by, among other means, the filing and prosecution of claims against fiduciaries who breach their duties under Title I of ERISA and against others who knowingly participate in such breaches.

17. The Plans are employee pension benefit plans as defined in ERISA § 3(2), 29 U.S.C. § 1002(2), sponsored by Enron Corporation. The Plans were not designed to comply with the provisions of ERISA § 404(c), 29 U.S.C. § 1104(c), or its related regulations (29 U.S.C. § 2550.404c-1) and neither the Savings Plan nor the ESOP in fact complied with those provisions. The Plans are named as defendants herein pursuant to Rule 19(a) of the Federal Rules of Civil Procedure solely to assure that complete relief can be granted.

18. Enron is an Oregon corporation with its principal place of business located at 1400 Smith Street, Houston, Texas

77002.  Enron is a "plan sponsor" of the Plans pursuant to ERISA
§ 3(16)(B), 29 U.S.C. § 1002(16)(B).  Further, as the entity
responsible for selecting, monitoring and removing fiduciaries
of the Plans and as the "administrator" of the ESOP within the
meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A), Enron is a
fiduciary of the Plans pursuant to ERISA § 3(21), 29 U.S.C.
§ 1002(21).

19.  James S. Prentice, Roderick J. Hayslett, Tod A.
Lindholm, Cindy K. Olson, Sheila D. Armsworth, and Paula H.
Rieker were members of the Administrative Committee for the
Plans (also referred to herein as the "Committee Defendants").
The Administrative Committee was designated by the Plans as the
"named fiduciary" of both the Savings Plan and the ESOP and the
"administrator" of the Savings Plan pursuant to ERISA
§ 3(16)(A), 29 U.S.C. § 1002(16)(A).  As such, the members of
the Administrative Committee were fiduciaries of the Plans
pursuant to ERISA § 3(21), 29 U.S.C. § 1002(21).

20.  Enron's Board of Directors included officers
Kenneth L. Lay (1985 until February 4, 2002) and Jeffrey K.
Skilling (1997 until August 14, 2001).  The Board of Directors
was also made up of non-officer directors (also known as
'Outside Directors') including Robert A. Belfer (1983 until June
6, 2002), Norman P. Blake, Jr. (1993 until June 6, 2002), Ronnie
C. Chan (1996 until March 14, 2002), John H. Duncan (1985 until

8

March 14, 2002), Wendy L. Gramm (1993 until June 6, 2002), Ken

L. Harrison (1997 until May 1, 2001), Robert K. Jaedicke (1985

until March 14, 2002), Charles A. LeMaistre (1985 until March

14, 2002), John Mendelsohn (1999 until May 30, 2002), Paulo V.

Ferraz Pereira (October 12, 1999 until March 14, 2002), Frank

Savage (October 12, 1999 until May 30, 2002), John Wakeham (1994

until March 14, 2002), and Herbert S. Winokur, Jr. (1985 until

June 6, 2002).  Because they were responsible for selecting,

monitoring and removing the ESOP's trustee, the members of the

Board of Directors are fiduciaries of the ESOP pursuant to ERISA

§ 3(21), 29 U.S.C. § 1002(21).


      **c.    Responsibility for Overseeing the Plans:**

          i.    <u>Committee Defendants - Responsible for Both
Plans</u>:

21.  As the named fiduciary for each of the Plans, the

Committee Defendants had full authority to control and manage

the operations of the Plans.  See ERISA § 402(a)(1), 29 U.S.C.

§ 1102(a)(1).  As fiduciaries, the Committee Defendants were

required by ERISA §§ 404(a)(1)(A) & (B), 29 U.S.C.

§§ 1104(a)(1)(A) & (B) to manage and oversee the Plans'

investments in Enron stock solely in the interest of the Plans'

participants and beneficiaries and with the care, skill,

prudence and diligence under the circumstances then prevailing

that a prudent man acting in a like capacity and familiar with
such matters would use in the conduct of an enterprise of a like
character and with like aims.

22.  The documents governing the Savings Plan spelled
out particular duties which the Committee Defendants had
relating to the Plans' investments in Enron stock including the
duty "[t]o direct the Trustee as to the investment of the Trust
Fund in Enron Stock" (Article XIII, Section 7.j of the Savings
Plan) and the responsibility "for allocating the assets of the
Fund among the Separate Accounts" (Article I, Section 1.a of the
Savings Plan Trust).

23.  The Administrative Committee was responsible for
deciding whether to include an Enron stock fund within the
Savings Plan (Savings Plan Article V, Section 2) and whether to
purchase Enron stock with Enron's employer contributions
(Savings Plan Article V, Section 1.a).

24.  Similarly, the ESOP gave the Committee Defendants
the responsibility to "direct the Trustee as to the purchase and
sale of Company Stock" (ESOP Article 14, Section 7.1) and to
"determine the extent to which the Trust Fund shall be invested
in Company Stock" (ESOP Article 16, Section 8).  Absent any
direction from the Committee Defendants, however, the ESOP
trustee was responsible for the "administration, investment and

10

management of the assets held under the [ESOP]" (Article 17, Section 2).

25.   Both the Savings Plan and the ESOP required the Administrative Committee to "discharge [its] duties and responsibilities with respect to the Plan:"

    (a)   Solely in the interest of the [participants], for the exclusive purpose of providing benefits to [participants] and their beneficiaries and of defraying reasonable expenses of administering the Plan [and trust];

    (b)   With the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

    (c)   By diversifying the investments of the Plan so as to minimize the risk of large losses, unless under the circumstances it is prudent not to do so; and

    (d)   In accordance with the documents and instruments governing the Plan insofar as such documents and instruments are consistent with applicable law.

(Savings Plan Article XV, Sections 3.a - 3.d; ESOP Article 17, Section 3).

    ii.   <u>Enron, Lay and Skilling - Responsible for Both Plans</u>:

26.   Enron had the power to select, monitor and remove the members of the Administrative Committee (Savings Plan Article XIII, Section 1 and Article XV, Section 2; ESOP Article 14, Section 1).   Consequently, Enron was a fiduciary of the

Plans pursuant to ERISA § 3(21), 29 U.S.C. § 1002(21), and subject to ERISA's duties of loyalty and prudence.  ERISA §§ 404(a)(1)(A) & (B), 29 U.S.C. §§ 1104(a)(1)(A) & (B).

27.  Enron's responsibilities to appoint, monitor and remove the members of the Administrative Committee were exercised by Lay and Skilling, both of whom appointed the Committee Defendants to their positions as fiduciaries.  Lay and Skilling were therefore fiduciaries of the Plans pursuant to ERISA § 3(21), 29 U.S.C. § 1002(21), and subject to ERISA's duties of loyalty and prudence.  ERISA §§ 404(a)(1)(A) & (B), 29 U.S.C. §§ 1104(a)(1)(A) & (B).

### iii  Board of Directors - Fiduciaries for the ESOP:

28.  The Board of Directors was solely responsible for selecting, monitoring and removing the ESOP's trustee.  ESOP Article 16, Section 1 ("The Trustee shall be appointed, removed, and replaced by and in the sole discretion of the Directors. The Trustee shall be the 'named fiduciary' with respect to the investment of the Trust Fund's assets").  Accordingly, the members of the Board of Directors were fiduciaries of the ESOP pursuant to ERISA § 3(21), 29 U.S.C. § 1002(21), and subject to ERISA's duties of loyalty and prudence.  ERISA §§ 404(a)(1)(A) & (B), 29 U.S.C. §§ 1104(a)(1)(A) & (B).

## II.   FACTUAL ALLEGATIONS:

### a.   Administrative Committee Members - Failed to Consider the Prudence of the Plans' Investment in Enron Stock as the Signs of Danger Increased:

29.   At the beginning of 2001, over sixty percent (60%) of the Plans' total assets consisted of Enron stock.  Yet, even though the value of Enron stock was critical to the pension security of the Plans' participants, the Administrative Committee did nothing to assess the prudence of investing in Enron stock.  Despite the continuing fall in the value of Enron stock throughout 2001, the Administrative Committee failed to properly consider whether it should reduce the Plans' holdings in Enron stock, eliminate Enron stock as an investment option under the Savings Plan, or invest employer contributions in anything other than Enron stock.

30.   In addition to the consistent decline in the value of Enron stock throughout 2001, there were many public articles which should have caused the Administrative Committee to at least consider the prudence of the Plans' huge investment in Enron stock and to make appropriate inquiries into Enron's financial condition.  One of the earliest and most widely publicized of these articles entitled "Is Enron overpriced?" was published in the March 5, 2001 issue of Fortune magazine:

> To skeptics, the lack of clarity [in Enron's financial statements] raises a red flag about Enron's pricey stock.  Even owners of the stock aren't uniformly

13

> sanguine. "I'm somewhat afraid of it," admits one
> portfolio manager. And the inability to get behind the
> numbers combined with ever higher expectations for the
> company may increase the chance of a nasty surprise.
> "Enron is an earnings-at-risk story,'' says Chris
> Wolfe, the equity market strategist at J.P. Morgan's
> private bank, who despite his remark is an Enron fan.
> "If it doesn't meet earnings, [the stock] could
> implode."

On March 5, 2001, Enron common stock's publicly reported closing

price was $70.11.

    31.   Thereafter, more bad news surfaced.  On March 9,

2001, Enron's highly touted multi-billion dollar deal to create

an exclusive "video on demand" system with Blockbuster, Inc.

terminated and Enron's aspirations to become a cutting edge

'high-tech' company became questionable.  As the Houston

Chronicle reported the next month:

> That news took a bit of the high-tech shine off the
> company at a time when Enron also was getting some bad
> news from its international operations and the market
> was losing its taste for high flying stocks.
> Suddenly, Enron's broadband business, which helped
> fuel the stock's rise last year, had become a drag.

On March 12, 2001, the next trading day after the Blockbuster

deal terminated, Enron common stock lost over 10% of its value

and reported a closing price of $61.27.

    32. On June 19, 2001, Enron stock posted a 52-week

low of $43.07, having lost almost $30 billion in market

capitalization since August of 2000.  In an article published

three days later entitled, "Power Baron Enron Finds Fortunes

14

Fading," the San Francisco Chronicle reported "[i]n the financial press, the continuing knock on Enron is that its business lines are so new and complex, and the company is so secretive about its operations, that analysts and fund managers don't feel confident in their understanding of what it does." On June 19, 2001, Enron common stock's publicly reported closing price was $46.18.

33.   Thereafter, on August 14, 2001, Skilling unexpectedly quit his position as CEO of Enron.  The Houston Chronicle reported on August 16th that "Skilling's departure simply added more questions, leaving investors wondering Wednesday who might fill the void and whether other problems are lurking."  On August 16, 2001, Enron common stock's publicly reported closing price was $36.85.

34.   At about the same time as Skilling's resignation, Sherron Watkins, a Vice President of Enron and a certified public accountant, advised Committee member Cindy Olson that she had grave concerns about Enron's accounting practices, financial health, and continued viability, as stated in more detail below.

35.   In the month that followed Skilling's resignation, the financial press published more articles speculating about the true reasons for Skilling's abrupt exit. For example, on September 17, 2001, in an article entitled "Enron's Power Crisis," Fortune Magazine described Skilling's



quitting as "bizarre" since "by leaving when and how he did,
Skilling forfeited a roughly $20 million severance package and
gained the responsibility of repaying a $2 million loan that
Enron would have forgiven had he stuck around until the end of
the year." On September 17, 2001, Enron common stock's publicly
reported closing price was $30.67.

36. One month later, on October 16, 2001, Enron
announced that it would report losses of $618 million for the
third quarter of 2001 - Enron's first reported loss in four
years. On top of this bad news, Enron also announced a $1
billion charge for write downs and a reduction in shareholder
equity of $1.2 billion. That same day, Moody's placed all of
Enron's long term debt obligations on review for downgrade. On
October 16, 2001, Enron common stock's publicly reported closing
price was $33.84.

37. Three days later, on October 19, 2001, the Wall
Street Journal began running a series of articles entitled
"Enron CFO's Partnership Had Millions in Profit," raising
questions about the propriety of partnerships run by Andrew S.
Fastow (Enron's CFO). Three days after that, on October 22,
2001, Enron publicly disclosed that the S.E.C. had started an
inquiry into its third quarter financial report. On October 22,
2001, Enron common stock's publicly reported closing price was
$20.65.

38. Two days later, on October 24, 2001, Enron announced that it had fired Fastow as its CFO. Within twenty-four hours, reversing a long-standing policy, Enron announced that it was drawing down (as cash) all of its available credit. On that day Standard & Poor's changed its outlook on Enron to "negative" and Fitch put Enron on a "negative watch." Also on October 25, 2001, Enron employees were informed that "normal document destruction policies" were suspended and were ordered to preserve all documents relating to transactions with LJM (the related party run by Fastow which the Wall Street had reported about). On October 25, 2001, Enron common stock's publicly reported closing price was $16.35.

39. By the next day, October 26, 2001, Enron's stock had lost four fifths of its January 2001 value. On that day, the Wall Street Journal reported that Enron bonds were trading at spreads "characteristic of a junk bond" and that the price of "default swaps" on Enron debt had surged. On October 26, 2001, Enron common stock's publicly reported closing price was $15.40.

40. On the afternoon of October 26, 2001, the Plans implemented a "lockdown" period during which participants were unable to transfer any Enron stock out of their Savings Plan and ESOP accounts while the Plans changed recordkeepers. Even though they understood that the participants were powerless to protect their own investments during the lockdown, the Committee

Defendants did nothing to protect the Plans' assets or to obtain timely advice regarding the Plans' investments in Enron stock during the lockdown.  During the lockdown, Enron's stock price fell from $15.40 (closing price on October 26, 2001) to $9.24 (closing price the last day of the lockdown - November 12, 2001), resulting in a forty percent (40%) reduction in the value of the Plans' holdings of Enron stock and reducing participant pensions by over $150 million dollars.

41.   Debt rating agencies began to publicly question Enron's financial prospects and issued further downgrades of Enron's credit ratings.  On October 29, 2001, Moody's downgraded Enron long term debt ratings and announced that it was keeping those ratings under review for further downgrade.  On October 29, 2001, Enron common stock's publicly reported closing price was $13.81.

42.   Two days later, on October 31, 2001, Enron reported that the SEC had opened a formal investigation.  On October 31, 2001, Enron common stock's publicly reported closing price was $13.90.

43.   The month of November 2001 brought even more bad news.  On November 1, 2001, Standard and Poor's lowered Enron's ratings and stated that "Enron's plan to employ asset sales and other means to repair its damaged balance sheet will be insufficient to restore its long-term credit quality to the

historical triple-B'-plus level." On November 1, 2001, Enron common stock's publicly reported closing price was $11.99.

44.   The average trading volume in Enron stock before October 16, 2001 was about 4.5 million shares a day. From October 16, 2001 until November 30, 2001 (the last trading day before Enron declared bankruptcy), the trading volume dramatically increased over thirteen-fold to more than 66 million shares per day. If the Plans' had sold the 25 million shares they held on November 1, 2001 at or near the November 1, 2001 market price of $11.99, the Plans would have received well over $290 million.

45.   On November 8, 2001, Enron restated its third quarter earnings (losses) and announced its intention to restate its finances for the past four and a half years. That same day, Enron announced it had commenced merger negotiations with Dynegy Corp. On November 8, 2001, Enron common stock's publicly reported closing price was $8.41.

46.   On December 2, 2001, Enron filed for bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York. Case No. 01-16034 (AJG). The next day, December 3, 2001, the reported closing price for Enron's common stock was 40 cents.

47.   In its February 12, 2002 Form 8-K filed with the SEC, Enron stated that "the existing equity of the company has

and will have no value." At the same time, Stephen Cooper, Enron's post-bankruptcy CEO, informed participants that they should expect to receive nothing for their stock in Enron's bankruptcy. Even at this late date, the Administrative Committee took no steps to evaluate the prudence of the Plans' extensive holdings in Enron stock, to liquidate all or part of the Plans' stockholdings, or to make any attempt to realize the $7 million that the Plans could have received for their shares on the over-the-counter (OTC) market at that time.

48. As the fiduciaries responsible for managing the Plans' investments in Enron stock, the Administrative Committee was obligated to act on information, including the facts set forth above, which they knew or should have known called into question the prudence of the Plans' extensive holdings in Enron stock. Instead, the Committee Defendants never seriously examined the prudence of the Plans' holdings of Enron stock, never made any inquiries about Enron's financial health, and never analyzed the significance of the facts set forth above.

49. From the beginning of the year to November 1, 2001, the Administrative Committee met as a group only five (5) times. None of these five meetings was attended by all of the Committee Defendants and at none of these meetings did the Administrative Committee discuss or review the Plans'

investments in Enron stock or discuss the Plans' catastrophic losses on those investments:

| Meeting Date | Start Time | End Time | Meeting Length | Enron Closing Price | % of Jan 01 Price |
|---|---|---|---|---|---|
| 01/02/01 | | | | $79.86 | |
| 02/08/01 | 3:45 PM | 4:50 PM | 1:05 | $80.00 | 100.17 |
| 05/03/01 | 3:15 PM | 4:30 PM | 1:15 | $58.35 | 67.42 |
| 06/25/01 | 2:10 PM | 4:50 PM | 2:40 | $44.07 | 55.17 |
| 08/15/01 | 3:15 PM | 4:10 PM | 0:55 | $40.25 | 50.39 |
| 09/18/01 | 3:15 PM | 4:30 PM | 1:15 | $28.08 | 35.15 |
| 11/01/01 | | | | $11.99 | 15.01 |

50.   By November 1, 2001, Enron's stock was worth only $11.99 per share - having lost more than four fifths of the value it had at the beginning of the year.   By comparison, on November 1, 2001 the general market for large corporations (the "S&P 500") had lost less than a fifth of the value it had at the start of the year (S&P 500 closed at 1283.27 on January 2, 2001 and closed at 1084.10 on November 1, 2001).   From the beginning of the year through November 1, 2001, Enron stock had fallen in value four times faster than the general market.

51.   Only after an investor class action lawsuit was filed against Enron on November 1, 2001, did the Administrative Committee finally take notice of the "volatility" of Enron's stock.   Thereafter, the Administrative Committee had almost daily meetings.   Yet, instead of taking action regarding the



Plans' investments in Enron stock even at this late date, the members of the Administrative Committee did nothing to protect those investments. Instead, they used the meetings to discuss their own potential liability and to meet with an attorney they had hired at the Plans' expense to represent them in their own defense.

**b.    Enron, Lay, Olson and the Board of Directors Ignored Sherron Watkins' Warnings in Performing Their Fiduciary Obligations:**

52.   On August 14, 2001, the day Skilling quit Enron, Sherron Watkins anonymously sent a memorandum to Lay expressing concern about the accuracy of Enron's publicly reported financial statements and about Enron's true financial health. Shortly thereafter, Watkins approached Defendant Olson (a member of the Plans' Administrative Committee), identified herself as the author of the memorandum (which she gave to Olson) and asked Olson to set up a meeting with Lay.

53.   At the time that she approached Olson and Lay, Watkins was a Vice President of Enron. Watkins held a master's degree in accounting from the University of Texas at Austin and had been a certified public accountant since 1983. She was first hired by Enron in October of 1993 and immediately given management responsibility over one of Enron's first large special purpose entities, a venture with the California Public

Employee Retirement System known as the Joint Energy Development
Investments limited partnership, or JEDI.

  54. In June of 2001, Watkins was tasked with
reviewing all assets that Enron was considering for sale and
with determining the likely economic impact of sale.  As part of
her work, she reviewed the estimated value of each asset and
determined that losses in those assets that had nominally been
hedged by a number of special purpose entities created by Enron
(collectively called the "Raptors") were not hedged at all, but
in reality had been incurred by Enron.  She was highly alarmed
by this and other facts and, after Skilling retired, decided to
set out her concerns in a written memorandum and contact Lay
directly.

  55. The memorandum provided by Watkins to Lay and to
Olson set forth specific concerns which Watkins had regarding
Enron's financial condition including, (1) worries relating to
questionable transactions between Enron and partnerships
operated by Enron officers and other entities, (2) doubts about
whether Enron's accounting was proper, (3) doubts about whether
Enron was accurately valuing certain assets on its books and (4)
worries that "[i]t sure looks to the layman on the street that
we are hiding losses."  Prophetically, Watkins wrote:

> I am incredibly nervous that [Enron] will implode in a
> wave of accounting scandals.  My 8 years of Enron work
> history will be worth nothing on my resume, the

business world will consider the past successes as nothing but an elaborate accounting hoax. Skilling is resigning now for 'personal reasons' but I think he wasn't having fun, looked down the road and knew this stuff was unfixable and would rather abandon ship now than resign in shame in 2 years.

56.    Thereafter, in a meeting arranged by Olson, on August 22, 2001, Watkins met with Lay and presented to him an expanded memorandum more fully detailing her concerns. In addition to the matters set forth in her original memorandum, Watkins informed Lay that some of Enron's hedging vehicles were nothing more than a "big bet" and quoted one of Enron's managers as stating, "I know it would be devastating to all of us, but I wish we would get caught. We're such a crooked company."

57.    On October 8, 2001, the Board of Directors was generally informed of the existence of Watkins' memorandum and the concerns it raised.

58.    The import of Watkins' memorandum was clear, or should have been clear, to Lay, Olson and the Board of Directors. Yet, instead of taking action to protect the Plans from the harm of which Watkins had warned, Lay and Olson responded to Watkins' memorandum by transferring Watkins to a position in Enron's Human Resources Department and by denying her further access to Enron's financial information. There, Watkins was allowed to report directly and only to Olson. Olson



then helped Fastow confiscate the lap top computer Watkins had used to draft her memorandum.

59. Neither Enron, Lay, Olson nor the Board of Directors informed the rest of the Plans' fiduciaries of Watkins' concerns or predictions nor did any of these fiduciaries ensure that an independent inquiry was undertaken on behalf of the Plans.

60. Although Lay, Olson, and the Board of Directors knew or should have known that the Watkins' memorandum described a grave threat to the Plans' assets, they did nothing to protect the Plans' interests. In particular, Olson failed to inform the other members of the Administrative Committee about Watkins' concerns and failed to ensure that any inquiry was undertaken on the Plans' behalf into those concerns. Enron and Lay failed to advise any other fiduciary of Watkins' concerns and failed to ensure that the Administrative Committee or any other fiduciary examined the specific issues Watkins had raised or the prudence of the Plans' investments in Enron stock. The members of the Board of Directors (including Lay) similarly failed to appoint a trustee for the ESOP, and failed to inform the ESOP's fiduciaries of Watkins' concerns.



c.    **Enron, Lay, Skilling and the Outside Members of the
Board of Directors Failed to Prudently Appoint and
Monitor the Plans' Fiduciaries:**

61.    The Board of Directors failed to name a trustee

for the ESOP as required by the ESOP and as required by ERISA

§ 403(a) (which mandates that all plan assets be held in trust

by one or more trustees).   ERISA § 403(a), 29 U.S.C. § 1103(a).

Because the ESOP's trustee was responsible for overseeing the

ESOP's investments in Enron stock, the failure of the Board

members to comply with their duties deprived the ESOP of a

fiduciary who would have been obliged to protect the ESOP's

holdings.   Although the Board of Directors deprived the ESOP of

a trustee, the members of the Board did not themselves undertake

to perform the trustee's fiduciary responsibilities or to

safeguard the interests of the ESOP.   The members of the Board

are liable for the losses caused by their failure to properly

appoint, monitor, and oversee an ESOP trustee that was obligated

to act prudently and with undivided loyalty to the ESOP's

participants.

62.    Similarly, Lay, Skilling and Enron failed to

monitor the Administrative Committee's performance of its

obligations, failed to inform the Administrative Committee of

information which they knew or should have known would have

caused a prudent fiduciary to reduce the Plans' holdings of

Enron stock, failed to remove members of the Administrative

Committee who were not properly discharging their fiduciary responsibilities, and failed to take any action calculated to protect the interests of the ESOP and Savings Plan with respect to Enron stock.

63.    Enron, Lay, Skilling and the Board of Directors knew or should have known all of the facts set forth in Section II.a of this Complaint.  In addition, the Board of Directors (including Lay and Skilling) knew of and repeatedly approved transactions involving Enron and Fastow in which Fastow's financial interests directly conflicted with Enron's interests. They knew, or should have known, that Fastow was using these transactions to reap large financial profits at Enron's expense.

64.    For example, documents issued by LJM, one of the partnerships run by Fastow, documented as early as October 26, 2000 that LJM was projecting an overall rate of return of 69% ($344,485,767) in profits on its then current deals with Enron including a number of "Raptor" deals such as:

Raptor I        Described by LJM as providing a projected 193% return for LJM over three years on $29.45 million invested with Enron.

Raptor II       Described by LJM as providing a projected 278% return for LJM over three years on another $29.95 million invested with Enron.



Raptor III    Described by LJM as providing a projected 2503%
return for LJM over three years on yet another
$29.95 million invested with Enron.

Skilling himself spoke at the October 26, 2000 meeting of LJM
investors where these disclosures were made.

65.    The details of each transaction between LJM and
Enron were set out on special "LJM Approval Sheets" created by
Enron at the express instruction of the Board of Directors so
that the members of Board of Directors could themselves review
the details of each transaction between Enron and LJM.

66.    Enron, Lay, Skilling and the Outside Members of
the Board of Directors knew or should have known that Enron had
engaged in a series of one-sided transactions with partnerships
and special purpose entities which created unjustified financial
risks for Enron that were not fully and fairly disclosed in
Enron's public financial statements.  Additionally, as they knew
or should have known, none of them were reviewing the nature or
terms of these transactions in a manner calculated to protect
the interests of Enron's shareholders, including the Plans.

67.    Beyond knowing about and approving the conflict
of interest transactions with Fastow, the Board of Directors
also had reason to know that the value of Enron's own assets
were being significantly overstated on its own books.  For
example, the Board of Directors, including Lay and Skilling, was

informed on April 2, 2001, that 64% of Enron's $8.6 billion asset portfolio was "troubled" or performing "below expectations."  Two months later, on June 1, 2001, they were informed that Enron's international assets were overvalued on its books by $2.3 billion.

68.    Although Enron, Lay, Skilling and the Outside Members of the Board of Directors possessed public and non-public information which should have caused them to question the prudence of the Plans' continued investments in Enron stock, they failed to take action to protect the Plans' investments in Enron stock from loss, to advise the Plans' other fiduciaries of the negative information known to them, to appoint a trustee for the ESOP at any time, to monitor the actions of the Administrative Committee, to ensure the prudence of the Plans' holdings in Enron stock, to replace the members of the Administrative Committee, or to take any action calculated to ensure that the Administrative Committee acted in a manner consistent with its duties of prudence and loyalty.

    d.    **Administrative Committee Member Lindholm Ignored Enron's Conflicted Transactions with Corporate Insiders in Performing His Fiduciary Responsibilities:**

69.    At least one Administrative Committee member, Lindholm, had specific reason to know of Enron's one-sided and disadvantageous transactions with corporate insiders.  On June



29, 2000, Lindholm approved the accounting treatment of a "bulk
fiber" sale to LJM that required Enron to guarantee at its own
expense a return on investment to LJM of at least 18%, jumping
to 25% or more after 24 months under certain conditions.  The
deal structure also required Enron to provide two thirds of
LJM's necessary financing ($66.4 million out of the $94.8
million necessary to accomplish the deal).

70.   At the time that he approved the "bulk fiber"
deal, Lindholm knew, or should have known, that LJM was taking
substantial guaranteed profits at Enron's expense.  Even so,
when acting as a fiduciary and member of the Administrative
Committee, Lindholm failed to inquire on behalf of the Plans as
to the reasons for the "bulk fiber" sale itself, to question on
behalf of the Plans the economic rationale for Enron's deals
with LJM or to take any action to inform the Plans' other
fiduciaries about Enron's dealings with LJM or Fastow.  Lindholm
also failed to inquire whether Enron was engaged in other unfair
transactions with LJM or other entities under the control of
corporate insiders such as Fastow.

71.   Had Lindholm made such inquiries, he would have
determined that the "bulk fiber" transaction was only the tip of
the iceberg and learned that Enron was engaged in numerous one-
sided transactions with LJM.  Had Lindholm made such inquiries,

he would have learned that the Plans' continued investments in Enron stock were not prudent.

72.   At no time did Lindholm take action to protect the Plans' investments in Enron stock from loss despite the specific information known to him relating to the "bulk fiber" transaction which should have caused him to question Enron's financial health and the accuracy of Enron's publicly reported financial statements.   Further, at no time did Lindholm inform the Plans' other fiduciaries of the "bulk fiber" deal although he knew or should have known that the terms of the deal cast doubt on the prudence of continued investment in Enron stock.

**e.   Lay Misinformed Participants About Enron's Financial Conditions:**

73.   At various times, Lay misrepresented to the Plans' participants certain facts relating to Enron's financial condition.   At the time that these misrepresentations were made to participants, Enron, Olson, the Board of Directors and Lay were in possession of information contradicting those representations.   When Lay made these misrepresentations, these fiduciaries knew or should have known that the Savings Plans' participants had the option of investing in Enron stock, that both Plans were already heavily invested in Enron stock and that the Plans' participants would rely on such representations in

making decisions whether to buy, hold or transfer shares of Enron stock.

74.    On August 14, 2001, Lay told participants that "I want to assure you that I have never felt better about the prospects for the company . . . Our performance has never been stronger; our business model has never been more robust; our growth has never been more certain . . . ."  The next month, on September 26, 2001, Lay issued statements encouraging participants to buy Enron stock and telling them that, "The balance sheet is strong.  Our financial liquidity has never been stronger."  In the same September 26, 2001, communication Lay also stated, "I can assure you that I or the Board of Directors, would not approve the use of any SPVs [Special Purpose Vehicles] or other types of financial vehicles unless we were convinced by all of our internal officers as well as our external auditor and counsel, that they were legal and totally appropriate."

75.    Neither at the time that these statements were made to the Plans' participants, nor at any time thereafter, did Enron, Lay, Olson or the Board of Directors provide participants or the Plans' other fiduciaries with information in their possession which contradicted the misrepresentations.

76.    In particular, neither Enron, Lay, Olson nor the Board of Directors revealed to anybody else that one of Enron's officers, Sherron Watkins, was not convinced that Enron's "SPVs

. . . were legal and totally appropriate."  Nor did Enron, Lay,
Olson or the Board of Directors reveal that at the time Lay
represented that Enron's "external auditor and counsel" had
determined the SPV's "were legal and totally appropriate",
Enron's outside auditor and counsel were still looking into the
substance of Watkins' allegations.

       77.  Further, neither Enron, Lay, Olson nor the Board
of Directors revealed the existence of Watkins' memorandum which
directly contradicted Lay's misrepresentations regarding the
SPVs, questioned Enron's accounting practices and cast doubt on
the prospects for Enron's stock price.  They also did not reveal
that the Directors had not reviewed the transactions involving
the "Special Purpose Vehicles" or inform the Plans' other
fiduciaries that Arthur Andersen had previously told the Board
of Directors that some of its judgments relating to the
accounting for those entities were "pushing the limits" and
subject to grave risk.

## III. ERISA'S FIDUCIARY PROVISIONS:

       78.  The Defendants were required to discharge their
duties with respect to the Plans with the care, skill, prudence
and diligence under the circumstances then prevailing that a
prudent person acting in a like capacity and familiar with such
matters would use in the conduct of an enterprise of a like

character and with like aims.   ERISA § 404(a)(1)(B), 29 U.S.C.
§ 1104(a)(1)(B).

79.   The Defendants were also required to discharge
their duties with respect to the Plans solely in the interest of
the participants and beneficiaries of the Plans and for the
exclusive purpose of providing benefits to participants and
their beneficiaries and defraying reasonable expenses of
administering the Plans.   ERISA § 404(a)(1)(A), 29 U.S.C.
§ 1104(a)(1)(A).

80.   The Defendants were further required to discharge
their duties with respect to the Plans in accordance with the
documents and instruments governing the Plans insofar as such
documents and instruments were consistent with ERISA's other
fiduciary provisions.   ERISA § 404(a)(1)(D), 29 U.S.C.
§ 1104(a)(1)(D).


COUNT I

ADMINISTRATIVE COMMITTEE

81.   Paragraphs 1 through 80 above are incorporated
herein as though fully set forth.

**a.    Committee Defendants Violated Their Duties of Prudence
       and Loyalty:**

82.   The Committee Defendants were obligated to, among
other things, monitor and review the prudence of the Plans'

34

investments in Enron stock and the prudence of maintaining an
Enron stock fund under the Savings Plan.  Despite the occurrence
of the above-listed events indicating serious problems with
Enron's financial condition and despite having the ongoing
obligation to monitor and review the Plans' investments in Enron
stock, at no time did any of the Committee Defendants take any
action to effectively monitor, review, analyze, question, alter,
slow, stop or protect the Plans' investment in Enron stock.

83.   The Committee Defendants imprudently continued to
purchase Enron stock with employer contributions under the
Savings Plan, maintained the Enron Stock Fund as an option for
participant-directed purchases under the Savings Plan throughout
2001 and failed to take appropriate action to protect both
Plans' existing investments in Enron stock.  As a result of the
Committee Defendants' imprudence, the Plans' incurred a loss for
which the Committee Defendants are liable.  ERISA § 409(a), 29
U.S.C. § 1109(a).

84.   Further, Committee Defendants Olson and Lindholm
could have, and should have, informed the other Committee
Defendants of specific information known to them which cast
doubt upon the prudence of the Plans' investments in Enron
stock, including information regarding Sherron Watkins'
memorandum and the details of Enron's "bulk fiber" deal with LJM
and they should have urged the Plans' other fiduciaries to



investigate that information and take all action necessary to protect the Plans. Because they failed to fulfill their duties in this regard, Olson and Lindholm are also liable for the Plans' losses caused thereby. ERISA § 409(a), 29 U.S.C. § 1109(a).

85. Each of the Committee Defendants knowingly participated in the failure of the other Committee Defendants to act prudently in their handling of the Plans' investments in Enron stock, enabled the other Committee Defendants to breach their own duties relating to the prudence of the Plans' investments in Enron stock and knew of the other Committee Defendants' failure to take action regarding the Plans' investments in Enron stock and failed to make reasonable efforts under the circumstances to remedy those breaches of duty. Accordingly, each of the Committee Defendants is liable as a co-fiduciary for the losses caused thereby. ERISA §§ 405(a)(1)-(3), 29 U.S.C. §§ 1105(a)(1)-(3).

      **b.** **Administrative Committee Member Olson Breached Her Duty of Loyalty By Failing to Correct Misstatements Made by Lay to Enron Participants and By Not Disclosing Watkins' Memorandum:**

86. Olson could and should have informed the other members of the Administrative Committee of the specific information contained in Watkins' memorandum. Instead, Olson acted to suppress knowledge of Watkins' memorandum, removed



Watkins from a position where she could find out accurate
information regarding Enron's financial condition and assisted
Fastow in seizing the computer on which Watkins wrote her
memorandum.

87.   Olson also failed to take any action to protect
the Plans' interests and stayed silent when she knew or should
have known that Enron's publicly-reported financial statements
were inaccurate and deceptive, when she knew or should have
known that Lay was misrepresenting Enron's financial condition
to the Plans' participants and when she knew or should have
known that silence would be harmful to the Plans' participants
who would rely upon Lay's misrepresentations in deciding whether
to buy, hold or sell Enron stock.

88.   Olson breached her duty of loyalty when she
failed to inform the other members of the Administrative
Committee or the Plans' participants about Sherron Watkins'
memorandum and failed to take any action to correct Lay's and
Enron's misrepresentations or to protect the Plans' interests.
Olson is liable for the losses caused to the Plans by her
actions and omissions.   ERISA § 409(a), 29 U.S.C. § 1109(a).

89.   Olson knowingly participated in the failure of
Enron and Lay to abide by their duty of loyalty through her own
inaction and silence, enabled the other Defendants to breach
their own fiduciary duties to the Plans and knew of the other

Defendants' inaction and silence relating to Lay's

misrepresentations and failed to make reasonable efforts under

the circumstances to remedy those breaches of duty.

Accordingly, Olson is liable as a co-fiduciary for the losses

caused thereby.  ERISA §§ 405(a)(1)-(3), 29 U.S.C.

§§ 1105(a)(1)-(3).

> **c. Committee Defendants Violated Their Duty to Abide by the Plans' Documents:**

90.  The Committee Defendants were obligated to abide

by the Plans' documents.  These documents required them, among

other things, to discharge their duties and responsibilities

with respect to the Plans:

(a)  Solely in the interest of the [participants], for the
exclusive purpose of providing benefits to
[participants] and their beneficiaries and of
defraying reasonable expenses of administering the
Plan [and trust];

(b)  With the care, skill, prudence and diligence under the
circumstances then prevailing that a prudent man
acting in a like capacity and familiar with such
matters would use in the conduct of an enterprise of a
like character and with like aims;

(c)  By diversifying the investments of the Plan so as to
minimize the risk of large losses, unless under the
circumstances it is prudent not to do so; and

(d)  In accordance with the documents and instruments
governing the Plan insofar as such documents and
instruments are consistent with applicable law.

91.  Despite the occurrence of the above-listed events

indicating serious problems with Enron's financial condition and

despite having the ongoing obligations set forth in the Plans' documents, at no time did any of the Committee Defendants take any action to effectively monitor, review, analyze, question, alter, slow, stop or protect the Plans' investment in Enron stock or otherwise comply with documents and instruments governing the Plans which required such action. As a result of the Committee Defendants' failure to act in accordance with the Plans' documents, the Plans incurred a loss for which the Committee Defendants are liable. ERISA § 409(a), 29 U.S.C. § 1109(a).

92. Each of the Committee Defendants knowingly participated in the failure of the other Committee Defendants to act in accordance with the Plans' documents in their handling of the Plans' investments in Enron stock, enabled the other Committee Defendants to breach their own duties to act in accordance with the Plans' documents and knew of the other Committee Defendants' failure to act in accordance with the Plans' documents and failed to make reasonable efforts under the circumstances to remedy those breaches of duty. Accordingly, each of the Committee Defendants is liable as a co-fiduciary for the losses caused thereby. ERISA §§ 405(a)(1)-(3), 29 U.S.C. §§ 1105(a)(1)-(3).

COUNT II

ENRON, LAY AND SKILLING

93.  Paragraphs 1 through 92 above are incorporated

herein as though fully set forth.

**a.  Enron, Lay and Skilling Imprudently Selected and
Monitored the Committee Defendants:**

94.  Enron had the authority and responsibility to

appoint and remove the Committee Defendants as fiduciaries of

the Plans and was obligated to monitor the Committee Defendants

in the performance of their duties.  Enron's responsibilities to

appoint and remove the Committee Defendants were exercised by

Lay and Skilling, both of whom appointed the Committee

Defendants to their positions as fiduciaries and both of whom

were obligated to monitor the Committee Defendants in the

performance of their duties.  Even so, at no time did Enron, Lay

or Skilling prudently consider or review the performance of the

Committee Defendants relating to the Plans' investments in Enron

stock, replace the Administrative Committee members with

suitable independent fiduciaries, inform the Committee members

of material misstatements by Lay and Enron, or take any other

action calculated to ensure that the members of the

Administrative Committee properly discharged their fiduciary