UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| PAMELA M. TITTLE, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>ENRON CORP., et al.,<br><br>Defendants. | No. H 01-CV-0913 |
| ELAINE L. CHAO, Secretary of the United States Department of Labor,<br><br>Plaintiff,<br><br>vs.<br><br>ENRON CORPORATION, et al.,<br><br>Defendants. | No. H-03-2257<br>Consolidated with<br>No. H-01-0913 |

**SECRETARY OF LABOR'S REPLY TO HEWITT'S OBJECTION TO SECRETARY'S MOTION FOR AN ORDER TO SHOW CAUSE WHY HEWITT SHOULD NOT BE HELD IN CIVIL CONTEMPT**

Elaine L. Chao, Secretary of the United States Department of Labor ("the Secretary"), hereby replies to the Objection of Hewitt Associates, L.L.C. ("Hewitt") to the Secretary's Motion for an Order to Show Cause Why Hewitt Should not be Held in Civil Contempt. As explained in the Secretary's Motion, Hewitt was responsible for a $22 million dollar "mistake" in carrying out this Court's order approving the parties' Second Supplemental Amended Plan of

Allocation (the July 24, 2006 "Allocation Plan").[1] While acknowledging its monumental error, Hewitt has done nothing in the intervening year since discovery to remedy the situation. Hewitt's admitted failure to follow the unambiguous terms of the court-approved Allocation Plan and its failure to remedy the consequences of its own noncompliance warrant holding Hewitt in civil contempt and granting the remedy set forth at pp. 17-18 of the Secretary's Motion.

Nothing in Hewitt's Objection should dissuade this Court from granting the Secretary's Motion, which offers the only just solution to the mess caused by Hewitt's misallocation of the Settlement Funds. In approving settlements that resulted in the deposit of over $228 million into the Settlement Trust, the Court explicitly "retain[ed] continuing jurisdiction over: (a) implementation of the Settlement; (b) any award or distribution of the Settlement Trust, including interest earned thereon; and (c) all other proceedings related to the implementation and enforcement of the Agreement." Case No. 01-3913, Docket Nos. 987 at 7 ¶ 28; 1075 at 8 ¶ 30; 1132 at 7 ¶ 25; 1219 at 7 ¶ 25. Thereafter, Hewitt voluntarily assumed responsibility for the court-approved Allocation Plan, improperly depleted Settlement Funds which were subject to this Court's continuing jurisdiction, and made it impossible for current plan participants to receive all of the funds to which they are entitled under the orders of this Court. This Court has ample authority in aid of its own jurisdiction to hold Hewitt responsible for the company's

---

[1] After accounting for future offsets and realistically attainable recoupment from the approximately 7,700 settlement-class members who received the $22 million "windfall," there will, absent an appropriate order of relief, remain a shortfall incurred by the remaining 12,600 settlement-class members totaling at least $9.15 million ($7.7 million principal amount plus interest). See Sec'y's Mot. 9. See also Enron's Motion to Require Initial Fund Administrator to Provide Funding for Upcoming Corrected Allocation, p. 1 (Case No. 01-3913, Docket No. 1346) ("$9.15 million estimated potential shortfall"). The Secretary has informally been informed by Enron that the amount may now be higher, $11.2 million.

non-compliance with its orders and misallocation of assets under the Court's jurisdiction. See 28 U.S.C. 1651 (All Writs Act).

A. Exercise of the Court's Contempt Power is Appropriate

The Secretary's Motion amply shows that the circumstances of this case fully meet the well-established standard applicable in this Court for finding civil contempt: "[a] party commits contempt when he violates a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995) (citation omitted). See Sec'y's Mot. 2-3, 12-14.

First, Hewitt violated a definite and specific order of the Court. The July 24, 2006 Allocation Plan approved by this Court required a determination of the recovery due to each member of the settlement class and allocation of the settlement funds accordingly. The Allocation Plan did not simply leave this determination to the discretion of Enron or the Fund Administrator; instead, it mandated the use of a simple formula based on the dollar value of Enron stock held in each class member's account on the first day of the class period, the value of any subsequent stock purchases and sales, and the value of the stock on the last day of the class period. Accordingly, under the terms of the court-approved formula, each class member who was a plan participant on January 1, 1998 (the first day of the class period) should have received an allocation that reflected an opening account balance determined using Enron's share price on the first day of the class period (January 1, 1998), $41.56. However, Hewitt, which by contract with Enron became the Fund Administrator, did not use that historically correct value, but instead allocated Settlement Trust funds based on an inflated arbitrary starting price of $100 per share for the ESOP's holdings on January 1, 1998. Consequently,

Hewitt plainly violated the terms of the court-approved Allocation Plan, resulting in the approximate $22 million misallocation of the initial settlement distribution to plan participants.[2]

Factually and legally, Hewitt's violation cannot be overlooked as mere "honest error[]." Hewitt Objection, at 11. As the Secretary previously argued, neither intent nor willfulness is relevant in civil contempt proceedings. Sec'y's Mot., at 12 (citing cases). In any event, Hewitt's malfeasance consisted not only of its initial error in using an incorrect share value for the Enron stock, but its failure, at multiple steps required by its Enron contract, to discover its error as it carried the incorrect data into every single participant's allocation. See, *e.g.*, Exhibit B, at 1.10 (Hewitt responsible for data "quality check" and for "balance closing"); 1.11 (Hewitt responsible to "[r]eview calculations for Claimant class" and to "confirm allocation calculations are correct for example populations of Claimants"). Compounding these errors, Hewitt also signed off on participant communications that represented that it had used the correct number, $41.56 per share, even though the fact is that it erred by using the $100 hypothetical number. See Hewitt Objection, Exhibit B, Appendix D ("Claimant Settlement Questions and Answers").[3] The misallocation of settlement funds should have been easy to

---

2 Class members who participated in the Enron ESOP, which held Enron stock on January 1, 1998, received the $22 million over-allocation. Class members who were participants in the Enron Savings Plan were under-allocated by the same amount.

3 The answer to question 7 in the participant communication stated in part, "your loss was calculated by taking the dollar value of Enron stock in your account on January 1, 1998" and "the January 1, 1998 Enron stock price is based on the December 31, 1997 closing price of $41.56 per share". Hewitt Objection, Exhibit B, Appendix D.

discover had Hewitt performed any of the checks it had agreed to perform. See Sec'y's Mot., at 8 n.8 (Hewitt's errors ultimately discovered by participants who did the math themselves).[4]

Second, Hewitt clearly acted with knowledge of the Court's order. When Hewitt entered into its contract with Enron, it agreed to make the calculations called for by the Allocation Plan (Hewitt Objection, Ex. B, pp 1.8-1.16), process transfers of settlement funds, (*id.*, at 1.18), issue wire instructions relating to settlement funds (*id.*), and process other payments of settlement funds (*id.*, at 1.19), as set forth in the July 31, 2006 agreement between Enron and Hewitt ("Implementation Agreement").[5] Although Hewitt now contends that the Court erred when it found that Hewitt was the Fund Administrator within the meaning of the Allocation Plan, the Court's finding is fully supported by these contractual provisions and by the Implementation Agreement generally, which authorized "Hewitt to proceed as planned with the first Tittle Settlement allocation of proceeds in accordance with … the terms of said Second Supplemental Amended Plan of Allocation." *Id.* (cover page). Not surprisingly,

---

[4] If the Court is concerned about the exact nature of Hewitt's errors, the Secretary believes that it may make sense to have a hearing to flesh out the extent of Hewitt's failure to comply with the many data-checking and verification steps it contracted to carry out. The Secretary is currently conducting an investigation into those matters (see Sec'y's Mot., at 5 n.4), but would not object to suspending that investigation, conducting expedited discovery on a schedule established by the Court, and participating in an evidentiary hearing on the question before the Court. In any such hearing, the Secretary would ask that Hewitt be required to produce employees knowledgeable about its work in carrying out the Allocation Plan including its affiant, Bob Dunlap, and the employees responsible for "data information." (Hewitt Objection, Exhibit B, at 1.43).

[5] Hewitt contractually agreed to implement the loss formula contained in the Plan of Allocation. Hewitt Objection, Exhibit B, page 1.27 (defining loss as - "Loss = First Day Value (A) + Investments (B) - Liquidations (C) - Last Day Value (D)"). "Loss" was defined in the Plan of Allocation using the exact same formula. See Sec'y's Mot., Exhibit A (Allocation Plan), at 11-13.

therefore, Hewitt does not contend that it acted or failed to act out of ignorance of what the court-approved Allocation Plan required.[6]

Despite Hewitt's contractual undertaking to administer the court-approved Allocation Plan and its misallocation of assets over which the Court retained jurisdiction, Hewitt argues instead that it may not be held in contempt because Hewitt is not a party to this action and the Allocation Plan was neither directed at it nor did it mention Hewitt by name. See Hewitt Objection, at 7-11. That, however, is not the relevant standard; notice, not party status, is the standard that determines whether a third party is beyond the reach of a court's contempt power. See *Chicago Truck Drivers v. Brotherhood Labor Leasing*, 207 F.3d 500, 507 (8th Cir. 2000); *United States v. Paccione*, 964 F.2d 1269, 1276 (2nd Cir. 1992); *Quinter v. Volkswagen of America*, 676 F.2d 969, 973 (3d Cir. 1982); *United States v. Hall*, 472 F.2d 261, 268 (5th Cir. 1972). This has been the standard for over a century:

> The facts that petitioner was not a party to such suit, nor served with process of subpoena, nor had notice of the application made by the complainant for the mandatory injunction, nor was served by the officers of the court with such injunction, are immaterial so long as it was made to appear that he had notice of the issuing of an injunction by the court. To render a person amenable to an injunction, it is neither necessary that he should have been a party to the suit in which the injunction was issued, nor to have been actually served with a copy of it, so long as he appears to have had actual notice.

*Ex parte Lennon*, 166 U.S. 548, 554 (1897).

Thus, "it is well-settled that a court's contempt power extends to non-parties who have notice of the court's order and the responsibility to comply with it." *Chicago Truck Drivers*,

---

[6] To the contrary, Hewitt acknowledges that it assisted Enron "in developing a settlement allocation protocol" in December 2005 (*i.e.*, before adoption of the Allocation Plan), and that, once the Plan was approved by the Court, Enron extended its contract with Hewitt and "formally authorized Hewitt to proceed with the allocation work." Hewitt Objection, at 4. See also Hewitt Objection, Exhibit B, at 1 (Hewitt agrees "to proceed as planned with the first Tittle Settlement allocation of proceeds in accordance with the . . . terms of said Second Supplemental Amended Plan of Allocation").

207 F.3d at 507. Here, Hewitt had actual notice of the court-approved Allocation Plan, but, notwithstanding such knowledge, mishandled monies subject to the Plan over which the Court had retained jurisdiction. It is therefore immaterial that Hewitt was not an original party to the underlying lawsuit or specifically named in the Allocation Plan. Where a third party's actions "disturb the adjudication of rights and obligations as between the original plaintiffs and defendants, and imperil the court's fundamental power to make a binding adjudication between the parties properly before it, broad applications of the power to punish for contempt may be necessary." *S.E.C. v. Pension Fund of America, L.C.*, 2006 WL 1104768, at *12 (S.D. Fla. 2006).[7]

A Second Circuit decision is directly on point. In *United States v. Paccione*, 964 F.2d 1269 (2nd Cir. 1992), a nonparty was held liable for civil and criminal contempt for violating orders prohibiting dissipation of assets of defendants. The court rejected arguments that it could not issue an order against a nonparty, noting that the nonparty's arguments did not "deal[] with a person who interfered with the *res*, the disposition of which the district court had specifically restricted, and who consciously impeded the rights, obligations and efforts of the parties bound by the court's order from attempting to comply with valid court orders." *Id.* at 1275. The court further found that the nonparty's signing an agreement that referred to the

---

[7] In the *Pension Fund of America* case, the court had enjoined the defendants from disposing of any assets, including those derived from a pension fund. The wife of a defendant, who was not herself a party, made post-receivership transfers from her separate accounts which contained money deriving from the pension fund. The court rejected the wife's argument that the court had no power to hold her in contempt where she was a nonparty acting solely in pursuit of her own interest. Instead, the court found both that she was not acting solely in her own interest, and that by dissipating assets of the receivership, she disturbed the adjudication of rights between the original plaintiffs and defendants and thus the court could exercise its contempt power over her. *Pension Fund of America*, 2006 WL 1104768, at *12. Similarly, Hewitt's actions have dissipated funds held within the Court's jurisdiction and thus the Court may exercise its contempt power over Hewitt.

court's earlier order gave the court "clear reason to believe [the nonparty] had sufficient notice of the district court's several orders pertaining to [the party], and that it was proper to hold him to the terms of those orders." *Id.* at 1276. Consequently, *Zenith Radio Corp. v. Hazeltine*, 395 U.S. 100, 110 (1969), *Bethel v. Peace*, 441 F.2d 495, 498 (5th Cir. 1971), and *Alemite Mfg. v. Staff*, 42 F.2d 832, 832-833 (2d Cir. 1930), upon which Hewitt relies (Objection, at 10), are inapposite to these circumstances, because none of those cases "dealt with a person who interfered with the *res*, the disposition of which the district court had specifically restricted, and who consciously impeded the rights, obligations and efforts of the parties bound by the court's order from attempting to comply with valid court orders." *Paccione*, 964 F.2d at 1275. This case, by contrast, deals with just that set of circumstances, about which there is no question that the contempt power applies regardless of Hewitt's nonparty status.[8]

Furthermore, to the extent that Hewitt was acting as Enron's agent, it would be bound by the court-approved Allocation Plan to the same degree as Enron. Rule 65(d) of the Federal Rules of Civil Procedure provides:

> Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts

---

[8] The Court's ability to compel nonparties to obey its orders, and to hold them in contempt for violation of its orders, may be at its strongest in a case such as this involving an action by the Secretary, because the fact that "federal courts possess broad authority 'to issue a variety of 'ancillary relief' measures in [enforcement] actions brought by [federal agencies]' cannot be gainsaid." *Federal Trade Com'n v. Productive Marketing, Inc.*, 136 F.Supp.2d 1096, 1104 (C.D.Cal. 2001) (citing *SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir.1980)). The *Productive Marketing* court rejected the nonparty's argument that contempt against a nonparty only applied in "extraordinary cases" and that otherwise the court could not compel a nonparty to follow its orders, and held that "[b]ecause [the third party's] conduct imperils the court's ability to render an effective judgment, the court may properly enjoin it, even though it is not a party to the action." Id. at 1106.

> sought to be restrained; and is binding only upon the parties to the action, their officers, *agents*, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

(emphasis added). The Supreme Court has held that this rule applies broadly, to all compulsory equitable decrees, and is not limited narrowly to injunctions. *International Longshoremen's Assn, Local 1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 75-76 (1967) ("*ILA*"); see *Commerce Park at DFW Freeport v. Mardian Const. Co.*, 729 F.2d 334, 342 (5th Cir.1984). As an agent of Enron in implementing the Allocation Plan, Hewitt was specifically bound by the Court's order concerning the settlement allocation. Certainly, if Enron had done directly what Hewitt did on its behalf, no one would consider such action to be beyond the threat of contempt. Thus, even if Hewitt were merely an agent of Enron, it could be bound as an agent to the same standard, and subject to the same sanction. Furthermore, an agent can be liable for contempt for violating an order even when the party it is legally identified with does not also violate the order and is not involved in the violation. See, *e.g.*, *Quinter*, 676 F.2d at 973 (expert witness and consultant for party who unlawfully distributed discovery item in violation of protective order was liable for contempt, although he acted outside the scope of his employment by committing the violation); *Productive Marketing*, 136 F.Supp.2d at 1103-06 (nonparty that failed to turn over misdirected assets of party to receiver was liable for contempt).[9]

---

[9] Thus, deliberately acting to aid and abet a violation of a court order is not the sole basis for holding a nonparty liable for a civil contempt remedy. Neither of the two cases cited by Hewitt for that proposition (*Travelhost*, 68 F.3d at 961, and *Waffenschmidt v. Mackay*, 763 F.2d 711, 717 (5th Cir. 1985)) are to the contrary. In any event, Hewitt was "in active concert" with Enron in implementing the Allocation Plan; and it was also "legally identified with" Enron with respect to implementation of the Allocation Plan. See *Additive Controls & Measurement Systems Inc. v. Flowdata, Inc.*, 154 F.3d 1345, 1352-53 (Fed. Cir. 1998); *Quinter*, 676 F.2d at 973. Moreover, this is not a case where Hewitt merely aided and abetted somebody else's

B. The Relief the Secretary Seeks is Definite and Appropriate

The "Supreme Court has repeatedly emphasized the broad equitable powers of the federal courts to shape equitable remedies to the necessities of particular cases, especially where a federal agency seeks enforcement in the public interest." *Productive Marketing*, 136 F.Supp.2d at 1104-05 (citing *Wencke*, 622 F.2d at 1371). That principle applies here. If this Court cannot compel Hewitt to provide a non-recourse loan in the amount it dissipated from the court-supervised fund, the fund will be unable to provide adequate redress to the Enron claimants, as required by the court-approved Settlement governing this case. The remedial purposes of the civil contempt power would be well served by granting the requested relief. See *American Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 585 (5th Cir. 2000) (civil contempt is remedial in nature and its purpose is to benefit the complainant); *Assoc. Bldrs. and Contractors of Louisiana, Inc. (Bayou Chapter) v. Sewerage*, 1996 WL 117528, *1 (E.D. La.); see also *Star Brite Distrib. Inc. v. Ocean Bio-Chem, Inc.*, 746 F. Supp. 633, 643 (E.D. Miss. 1990) (citing *Whitfield v. Pennington*, 832 F.2d 909 (5th Cir. 1987)). "In a contempt proceeding, the need to ensure that the plaintiff is fully compensated and that the defendant is deterred, is acute." *Brine, Inc. v. STX, L.L.C.*, 367 F.Supp.2d 61, 71 (D. Mass. 2005).

Hewitt argues that the Secretary's prayer for a $9.15 million loan is improper because the "final amount of the deficiency, if there is one, is unknown." Hewitt Objection, at 12. That assertion is not true. In fact, the full and exact amount of the deficiency is well known -- it is $21,849,788.29 plus interest from the date Hewitt effectuated its 7,724 overpayments. Hewitt

violation of court orders. Instead, Hewitt, exercising its direct authority over court-supervised funds, committed the contempt of court itself by mishandling $22 million in the funds. As a result, the Enron plan participants are unable to receive their full entitlement under this Court's orders, and court-supervised funds have been wrongfully depleted. Hewitt's acknowledgment that it was solely responsible for the misallocation is thus an admission against interest, not a defense to a motion for contempt.

Objection, Exhibit F (total amount of overpayments). True, that deficiency may be offset from future distributions and Hewitt may be able to recoup amounts as overpayments are recovered, and it is for this reason that the Secretary does not seek now the full amount of the deficiency from Hewitt. However, the Secretary's willingness to ask for a reduced amount does not mean that the full amount of damage caused by Hewitt's contempt is not known or subject to a judgment certain. That amount is $21,849,788.29 plus interest.

Because of Hewitt's mistake, some participants have received money to which they were not entitled and some have received too little. Many may have relied upon the accuracy of Hewitt's calculations in accepting that money, have expended the money based on such assumptions, and would be injured by aggressive collection efforts. Part of fixing the problem Hewitt has created is ensuring that a) appropriate collection efforts proceed, and b) that those efforts not be abusive. Thus, the Secretary's proposed remedy stems directly from the problem Hewitt created and merely seeks to ensure that a settlement which was supposed to compensate participants for past wrongs doesn't create new wrongs and injuries.

Absent the relief requested by the Secretary, compliance with the Court's orders is impossible. Because of Hewitt's actions the money is simply not there and class members cannot receive all the funds to which they are entitled under this Court's orders. At the same time, the proposed relief fully protects Hewitt from any danger that it ultimately will pay too much since successful collection and offset efforts will redound to Hewitt's benefit and the proposed remedy leaves Hewitt free to pursue its indemnification claim against Enron. [10]

---

[10] The Secretary takes no position on Hewitt's argument that Enron may be contractually responsible to indemnify Hewitt for any amounts it must pay for its contempt under the indemnification provisions in an Administrative Services Agreement ("ASA," attached to Hewitt's Objection as Exhibit A). Whatever the ASA requires, however, it does not bind non-signatories including the Secretary, the Court, the Tittle Plaintiffs and the participants in the

Hewitt's apparent belief is that Enron should pay for Hewitt's mistake, and that the Court, the Secretary, the Tittle Plaintiffs and everyone else should excuse Hewitt's failures because Enron might be liable as well. See Hewitt Objection, at 1-2 The Secretary does not disagree that Enron may be liable under Title I of ERISA for Hewitt's complete misallocation of settlement funds because of Enron's possible failure to supervise Hewitt appropriately, failure to notice Hewitt's errors or failure to otherwise prevent the damage that Hewitt caused. The Secretary is conducting an investigation under Title I of ERISA regarding Enron's possible liability and, if the facts support such claims, the Secretary may bring them as appropriate. But even under Hewitt's theory, Enron's liability is only secondary to Hewitt's and not a bar to Hewitt's own liability. Cf. *Schrum v. Land*, 12 F.Supp.2d 576, 582, n.2 (S.D. Tex. 1997) ("where an agent commits a tort while acting within the scope of his employment as the agent of another, he will be personally liable in damages, even though his principal is also liable." (quoting *Leonard Duckworth, Inc. v. Michael L. Field & Co.*, 516 F.2d 952, 958 (5th Cir. 1975)).[11]

Conclusion

For all the reasons set forth above and in the Secretary's original motion, these facts warrant a finding of contempt and the proposed remedy.

---

Enron Corp. Savings Plan and Enron Corp. ESOP. Hewitt's contract with Enron specifically provides that there are "No Third Party Beneficiaries." See Exhibit A to Hewitt's Objection, page 21 (Section 17.1 of the "ASA"). The only parties to the contract were Enron Corp. and Hewitt. See Hewitt's Exhibit A, pp 1, 22. Consequently, the ASA and its provisions are simply irrelevant to the instant motion by the Secretary.

[11] Accord *East Texas Mack Sales, Inc. v. Northwest Acceptance Corp.*, 819 F.2d 116, 119-20 (5th Cir. 1987) (also quoting *Duckworth*); *Dillon v. AFBIC Development Corp.*, 597 F.2d 556, 562 (5th Cir. 1979) ("'(a)n agent who does an act otherwise a tort is not relieved from liability by the fact that he acted at the command of the principal or on account of the principal'. [Restatement (Second) of Agency §] 343. Furthermore, an agent who assists his principal in committing a tort is himself liable as a joint tortfeasor. Id.")

Dated this 7th day of March 2008.

Respectfully submitted:

GREGORY F. JACOB
Solicitor of Labor

TIMOTHY D. HAUSER
Associate Solicitor
Plan Benefits Security Division

NATHANIEL I. SPILLER
Counsel for Appellate and Special Litigation

MICHAEL SCHLOSS
Senior Trial Attorney
Attorney-in-Charge

By: [signature]
ROBIN SPRINGBERG PARRY
Senior Trial Attorney
U.S. Department of Labor
Office of the Solicitor
(Mail Address)
Plan Benefits Security Division
P.O. Box 1914
Washington, D.C. 20013
(Delivery Address)
200 Constitution Ave., N.W.
Room N-4611
Washington, D.C. 20210
Phone: (202) 693-5600
Fax: (202) 693-5610

**Attorneys for Plaintiff Secretary of Labor**

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing has been served upon all known counsel of record by sending a copy via electronic mail to serve@ESL3624.com, pursuant to the Court's Order dated August 7, 2002 (Docket No. 984) on this 7th day of March, 2008.

Robin Springberg Parry